UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ROBERT MITCHELL DUNCAN, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:20-cv-200 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| SAM'S EAST, INC., | : | |
| | : | |
| Defendant. | : | |

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 18)**

This case involves Robert Mitchell Duncan's ("Duncan") suit alleging claims against his former employer, Sam's East, Inc. ("Sam's Club"), under the Age Discrimination in Employment Act ("ADEA") and Ohio's age discrimination laws. Pending before the Court is Sam's Club's Motion for Summary Judgment (the "Motion"). (Doc. No. 18.) Sam's Club argues that Duncan was not qualified for his position due to a number of disciplinary issues and it was entitled to terminate him because he improperly handled a racially-charged incident at his Club. (Doc. No. 18 at PageID 95.) Duncan argues that he responded to the racial incident in accordance with Sam's Club's policies and that his termination was the result of a senior Sam's Club official's discriminatory attitude towards older managers. (Doc. No. 19.) In reply, Sam's Club argues that Duncan has failed to demonstrate the attitudes of other Sam's Club officials affected the decision of Duncan's supervisor. (Doc. No. 20.)

The Court **GRANTS** Defendant's Motion for Summary Judgment and dismisses the case.

1

I.  **BACKGROUND** [1]

Duncan was first hired by Sam's Club in 1993. (Doc. No. 18-1 at PageID 107.) He was promoted to Club Co-Manager in 2002 and to Club Manager in 2004. (*Id*. at PageID 108.) The Club Manager is responsible for managing employees, ensuring member[2] satisfaction, maintaining the Club's appearance, and generally supporting the Club's operations. (*Id*. at PageID 118.) Duncan's Assistant Manager was Juliann Naas ("Naas"), who had previously served as a Co-Manager before returning to the assistant role for personal reasons. (Doc No. 19-2 at PageID 393, 396-98.)

In January 2019, a cashier at Duncan's Club complained that another employee was threatening her, so an ethics ticket was submitted to Walmart's Global Ethics department. (Doc. No. 18-10.) Duncan spoke to the two employees, ultimately advising the employee who made the threat that such conduct would not be tolerated and directing his subordinates to keep the two employees apart. (Doc. No. 18-1 at PageID 129.) In February 2019, a caller reported to Global Ethics that Duncan had not conducted a proper investigation and reported that more threats had been made by the same employee who made the initial threats. (Doc. No. 18-13.) The reporter further stated that Duncan spoke to the employee, but did not take any further action. (*Id*.) Duncan's supervisor at the time, Raina Brummett ("Brummett"), investigated the incident and expressed her disappointment in Duncan's investigation and advised him that he needed to conduct more thorough investigations in the future, but she did not issue a coaching.[3] (Doc. No. 18-14 at PageID 306.)

---

[1] For purposes of resolving the Motion, the recitation in the "Background" section includes undisputed facts and otherwise assumes the evidence of the non-moving party as true and draws all reasonable inferences in the nonmoving party's favor, as is appropriate at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Tolan v. Cotton*, 572 U.S. 650, 660, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014).
[2] Sam's Club refers to its customers as members and its individual stores as Clubs..
[3] As explained below, Sam's Club refers to the various levels of discipline in its disciplinary policy as "coachings."

On April 2, 2019, an African-American member complained to Naas that an employee called her son a monkey and asked if he liked bananas. (Doc. No. 18-1 at PageID 139, 145.) Duncan learned of the incident that evening when Naas reported it to him. (Doc. Nos. 18-12 at PageID 286; 18-16 at PageID 319.) Duncan instructed Naas to call Jennifer Dodson ("Dodson"), a human resources employee, and inform her of the incident. (Doc. No. 18-1 at PageID 186; Doc. No. 19-2 at PageID 402.) Dodson told Naas to speak to the employee, but did not recommend any other action. (Doc. No. 19-2 at PageID 404.)

The following day, April 3, at the direction of Dodson and Duncan separately, Naas reported the incident to Global Ethics. (Doc. Nos. 18-9 at PageID 265; 18-12 at PageID 287-88; 18-17; 18-18.) Naas further emailed Joe Mohrhaus ("Mohrhaus"), who had replaced Brummett as Duncan's immediate supervisor, and informed him there had been a situation at the Club and it had been posted about on Facebook. (Doc. Nos. 18-1 at PageID 141-42; 18-18; 18-21 at PageID 287.) Naas did not inform Mohrhaus of the specifics of the incident. (Doc. No. 18-18.)

On April 4, Duncan left for vacation in California, leaving Naas in charge of the club. (Doc. No. 18-1 at PageID 137.) He returned on April 15. (*Id*. at PageID 138.) Duncan did not view the Facebook post and instructed Naas to stay on top of it. (Doc. No. 18-1 at PageID 141.) The post garnered 83 comments, 38 shares, and 66 reactions on Facebook. (Doc. No. 18-9 at PageID 272-80.) The comments on the post included plans to cancel memberships, calls to file a lawsuit or a Charge with the Ohio Civil Rights Commission, offers to go to the media, and posts sharing the contact information of Walmart executives. (*Id*.)

On April 8, 2019, a human resources employee forwarded an ethics report from April 5 to Mohrhaus because "it sounds like a group of members were upset." (Doc. No. 18-22.) Mohrhaus contacted Naas and learned that the employee had received a verbal discussion. (Doc. No. 18-12

3

at PageID 290.) Mohrhaus escalated the matter to his supervisor, Louie Santos, who apprised Executive Vice President Gisel Ruiz of the situation. (Doc. Nos. 18-21 at PageID 333-34; 18-23; 18-24.) Mohrhaus ultimately had the employee who made the racist comment terminated. (Doc. No. 18-23 at PageID 339.)

On April 23, 2019, Mohrhaus met with Duncan to discuss the handling of the incident. (Doc. Nos. 18-25; 18-26.) Brummett also attended the meeting. (Doc. Nos. 18-25; 18-26.) During the meeting the racial incident was discussed, and Duncan agreed that there was poor communication, a lack of urgency, and a lack of follow-up in his handling of the situation. (Doc. No. 18-1 at PageID 145.) Brummett also raised the issue of the February 2019 investigation and their discussion regarding conducting thorough investigations. (Doc. No. 18-25; 18-26.)

Sam's Club uses a progressive disciplinary policy for when performance or conduct issues arise. (*See* Doc. No. 18-6.) The disciplinary policy provides for three levels of discipline that may be issued on a rolling 12-month basis. (Doc. No. 18-6 at PageID 243.) The three levels of discipline, referred to as coaching, consist of yellow, orange, and red, with termination possible after a red-level disciplinary action. (*Id*.) From 2005 to 2019, Duncan was disciplined five times, with a yellow level coaching in 2017 and an orange level coaching action in 2018. (Doc. No. 18-27.) Duncan was ultimately terminated on April 26, 2019. (*Id*.) Sam's Club replaced Duncan, who was 62, with a manager who was 26 years old. (Doc. No. 19 at PageID 372.)

Duncan filed his Complaint on May 28, 2020 and alleged claims of age discrimination and retaliation under the ADEA and Ohio law. (Doc. No. 1.) Discovery ended on September 17, 2021. (Doc. No. 16.) Sam's Club filed its Motion on September 24, 2021 (Doc. No. 18), and Duncan filed his response on October 14, 2021 (Doc. No. 19). Sam's Club filed its reply on October 28, 2021. (Doc. No. 20.) This matter is fully briefed and ripe for review.

## II. LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The burden then shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id.* at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed.

R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id*. at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id*. The inquiry, then, is "whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id*.

### III.   ANALYSIS

In the Motion, Sam's Club offers three arguments for why they are entitled to summary judgement: (1) Duncan's *prima facie* case fails because he was not qualified for his job; (2) Duncan cannot rebut Sam's Club nondiscriminatory reason for his termination; and, (3) Duncan cannot offer any evidence showing age was the reason for his termination. (Doc. No. 18.)

#### A. Unlawful Discrimination Claim

The ADEA makes it "unlawful for an employer to … discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions,

6

or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, the Ohio Revised Code states that "[n]o employer shall discriminate in any job opening against any applicant or discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee." Ohio Rev. Code § 4112.14(A). "Under Ohio law, the elements and burden of proof in a state age-discrimination claim parallel the ADEA analysis." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003); *see also Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 727 (6th Cir. 2007) ("Ohio courts generally decide state law age discrimination claims under federal law interpreting Title VII").

"Plaintiffs must 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the but-for cause of the challenged employer decision.'" *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 323-24 (6th Cir. 2021) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). "This requires showing that age was the determinative reason they were terminated; that is, they must show that age was the reason that the employer decided to act." *Id*. at 324 (internal quotation marks omitted; emphasis removed). "Under *Gross*, satisfying but-for cause requires plaintiffs to show that age had a determinative influence on the outcome of the employer's decision-making process." *Id*. (internal quotation marks omitted; emphasis removed). Thus, to defeat summary judgment on a claim of age discrimination under the ADEA, a plaintiff "must show a genuine dispute of material fact that, if resolved in her favor, could persuade a reasonable juror that age was the but-for cause of her termination." *Id*.

A plaintiff who cannot show age discrimination with direct evidence "may attempt to show age discrimination with circumstantial evidence," which courts "evaluate using the three-step burden shifting analysis" from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973).

7

*Pelcha*, 988 F.3d at 324. In the first step, the plaintiff must establish a *prima facie* case of discrimination. *Id*. at 325. Thus, the "plaintiff has the initial burden of demonstrating" the elements of the claim. *Corrigan*, 478 F.3d at 727. If the plaintiff succeeds, then for the second step "the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the termination." *Pelcha*, 988 F.3d at 325. If the employer does so, then for the third step "the burden shifts back to the plaintiff to prove the employer's reason is a mere pretext." *Id*. "If the plaintiff prevails, the factfinder may reasonably infer discrimination." *Id*.

### b. The *Prima Facie* Case

Duncan does not attempt to show age discrimination by direct evidence; therefore, the Court moves to the first step of the *McDonnell Douglas* burden shifting analysis. Duncan must establish a *prima facie* case of age discrimination by showing, "(1) [he] was a member of a protected class (older than 40 years old); (2) [he] suffered an adverse employment action; (3) [he] was qualified for the position held; and (4) [he] was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably." *Pelcha*, 988 F.3d at 324, 326. The showing must be made "by a preponderance of the evidence." *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1390 (6th Cir. 1993). "This light burden is easily met and not onerous." *Pelcha*, 988 F.3d at 326. However, it still must be met. *See, e.g., Grosjean*, 349 F.3d at 334 (affirming summary judgment for employer where plaintiff former employee "failed to make his prima facie case of age discrimination because he was not replaced by a person significantly younger than himself"); *see also Texas Dept. of Cmty. Aff. v. Burdine*, 450 U.S. 248, 253-54 (1981) ("[t]he prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection").

Here, Sam's Club does not dispute the first, second, or fourth elements of Duncan's *prima*

8

*facie* case. Instead, Sam's Club argues that Duncan was not qualified for his position because he was not performing to "a level which met [his] employer's legitimate expectations." (Doc. No. 18 at PageID 95.) Duncan argues that this is not the correct test. (Doc. No. 19 at PageID 371-72.) Rather, the correct test is whether Duncan possessed the "objective qualifications" required for his position. (*Id*.)

The Sixth Circuit laid out the relevant inquiry in *Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003). In *Wexler*, the Sixth Circuit determined, "[a]t the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job." *Id*. at 575. Indeed, the plaintiff may meet his burden by "presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id*.; *Guyton v. Exact Software N. Am.*, No. 2:14-CV-502, 2016 U.S. Dist. LEXIS 95265, at *26 (S.D. Ohio July 21, 2016). The Court's qualification analysis should not be conflated with the defendant's nondiscriminatory reason for termination. *Schneider v. P&G*, No. 1:10-CV-747, 2012 U.S. Dist. LEXIS 6501, at *28 (S.D. Ohio Jan. 20, 2012) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000)).

Duncan's objective qualifications demonstrate that he met the minimum criteria for employment as a Club Manager. Duncan had been employed by Sam's Club since 1993 and had been a Manager since 2004. (Doc. No. 18 at PageID 86.) Duncan's 26 years at Sam's Club, including his 15 years as a Manager, are credible evidence that he met the minimum criteria for employment as manager in 2019.

Sam's Club's arguments regarding Duncan's performance reviews and his handling of the racial incident improperly conflates its nondiscriminatory reason for his termination and Duncan's *objective* qualifications. To follow Sam's Club's proposed rationale would short circuit the

9

*McDonnell Douglas* analysis by allowing the employer to avoid the second and third steps and simply argue its non-discriminatory reason right off the bat. The Court refuses to do so here. Therefore, Duncan has established a *prima facie* case of discrimination.

      **c.  The Nondiscriminatory Reason and Pretext**

The second step of the *McDonnell Douglas* test requires the defendant to identify a legitimate, non-discriminatory reason for the plaintiff's adverse employment action. *Pelcha*, 988 F.3d at 325. Sam's Club has done so here, explaining that the termination was consistent with its progressive discipline policy. (Doc. No. 18 at PageID 97.) Sam's Club further states that Duncan's handling of the racial incident alone was sufficient to justify his termination. (*Id*.)

Moving to the third step, an employee may rebut the legitimate, nondiscriminatory reason offered by an employer by making one or more of three showings regarding the stated reason, "'(1) [the reason] has no basis in fact, (2) [it] did not actually motivate the defendant's challenged conduct, or (3) [it] was insufficient to warrant the challenged conduct.'" *Wexler*, 317 F.3d at 576 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)); *Briggs v. Potter*, 463 F.3d 507, 515 (6th Cir. 2006).

Sam's Club's reason for Duncan's termination was his failure to investigate and handle the racial incident. (Doc. No. 18 at PageID 93.) Sam's Club also determined that, at a minimum, the handling of the racial incident would have warranted a two-level coaching and, since Duncan was on an orange level coaching already, this also would have justified termination. (*Id*.)

In response, Duncan makes a number of arguments. First, he argues that he appropriately delegated his managerial responsibilities to Naas while he was on vacation; therefore, the racial incident alone is insufficient to justify his termination. (Doc. No. 19 at PageID 373.) Second, Duncan argues that a number of other people bear some blame for the handling of the racial

10

incident's social media post and the handling of the entire situation. (*Id*. at PageID 374-75.) Third, he argues that Sam's Club cannot rely on prior incidents or coachings because he was either not disciplined or the coachings were fraudulent. (*Id*. at PageID 376-78.) Finally, Duncan argues that Brummett's age bias was the reason for his termination. (*Id*. at PageID 379.)

Duncan's arguments essentially fall within the second and third categories of the court's pretextual analysis. The Court will consider Duncan's arguments under these two categories.

### i. Asserted Reason Did Not Actually Motivate the Termination

#### 1. Disparate Treatment

Duncan argues that a number of other individuals and departments bear some blame for the handling of the racial incident and the related social media post. (Doc. No. 19 at PageID 374-75.) In his response, Duncan notes that Santos expressed disappointment in the way the Media Relations and Ethics departments handled their aspects of the racial incidents. (*Id*. at PageID 374.) He further notes that neither Naas nor Mohrhaus were punished for their failures in responding to the racial incident. (*Id*. at PageID 374-75.) Without citing any legal support for his position, Duncan argues that the lack of discipline for any other Sam's Club employees involved in this situation demonstrates that his handling of the racial incident did not motivate his termination. (*Id*. at PageID 376.)

To establish pretext via disparate treatment, the plaintiff must establish that the other employees "(1) 'dealt with the same supervisor,' (2) w[ere] 'subject to the same standards,' and… (3) 'engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Pelcha*, 988 F.3d at 328 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). Duncan's attempt to lump his supervisor, subordinate, and two entire departments into the same

boat is unavailing. While Santos does express disappointment in the lack of reporting by the Media Relations and Ethics departments, it is unclear who the supervisor is for these two departments. Moreover, it is difficult to imagine entire departments being subject to the same standards as the manager of a single club, let alone the club where the incident took place.

Indeed, Mohrhaus and Naas are equally poor comparators. Mohrhaus answers to Santos himself and, as Duncan's boss, he would be subject to a different standard than his subordinate. Additionally, their conduct is dissimilar. Mohrhaus and Duncan received the pertinent details of the racial incident at different times. While it may be said that Mohrhaus should have followed up on Naas' April 3 email regarding the "situation," there was hardly enough detail for Mohrhaus to realize the severity of the matter. Moreover, Mohrhaus appears to have worked to inform his superiors of the situation immediately upon learning of the details of the incident.

Similarly, Naas was Duncan's subordinate and had different expectations. Plus, it appears that many of the actions Naas took, by Duncan's own admission, were at his direction. Duncan's statement of the facts is replete with references to what Naas was instructed to do and the facts she reported back to him. (Doc. No. 19 at PageID 366-67.) Moreover, Duncan states that Naas remained in contact with him while he was on vacation. (*Id*.) Duncan cannot rely on a narrative to demonstrate he was managing the situation and then complain that his subordinate was not disciplined for following his instructions in that narrative.

The Courts finds that Mohrhaus, Naas, the Media Relations department, and the Ethics department are not valid comparators for Duncan in this case.

### 2. Cat's Paw Theory

Duncan further argues that Brummett's age bias was the reason for his termination because Mohrhaus had decided to discipline him at a less severely. (Doc. No. 19 at PageID 379.) Duncan

12

argues that Brummett, due to her age bias, influenced Mohrhaus' decision making and caused Duncan's termination. (*Id.*) Such a theory is referred to as a cat's paw.

Under a cat's paw theory, a plaintiff may challenge an employer's improper treatment even if the decisionmaker was neutral and not motivated by discriminatory animus. *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666, 677 (6th Cir. 2008); *Mastellone v. Publix Super Mkts., Inc.*, No. 3:14-CV-433, 179 F. Supp. 3d 784, 794 (E.D. Tenn. Apr. 5, 2016). When the adverse employment "'decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability.'" *Bishop v. Ohio Dep't of Rehab. & Corr.*, 529 F. App'x 685, 696 (6th Cir. 2013) (quoting *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008)). To succeed on a cat's paw theory, the employee must establish a causal nexus between the ultimate decisionmaker's decision to terminate and the discriminatory animus of another individual. *Bishop*, 529 F. App'x at 696 (citing *Madden*, 549 F.3d at 677). Simply put, the employee must show that the ultimate decisionmaker was a conduit for the individual's prejudice through their reliance on a discriminatory flow of information. *Bishop*, 529 F. App'x at 696 (citing *Madden*, 549 F.3d at 677). A causal nexus is lacking if the ultimate decision resulted from an independent investigation and the employee fails to present evidence that discriminatory animus influenced the supervisor's decision. *Bishop*, 529 F. App'x at 696 (citing *Madden*, 549 F.3d at 677); *Goodsite v. Norfolk Southern Ry.*, 573 F. App'x 572, 586 (6th Cir. 2014)). An adequate nexus may exist where a decisionmaker relies on the assessment or evaluation of an employee with discriminatory animus. *Noble*, 391 F.3d at 723.

To provide the evidence necessary to establish the causal nexus, the plaintiff typically

13

needs to demonstrate that the individual with the animus provided "tainted information" or was involved in the decision-making process in some substantive way. *Bishop*, 529 F. App'x at 696-98 (holding that an issue of fact existed because the supervisor appeared to have relied solely on the evaluation of a biased subordinate); *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) ("courts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee"); *Noble*, 391 F.3d at 723-24 (holding that the plaintiff failed to establish a causal nexus between the individual's discriminatory treatment of the plaintiff and the subsequent decision to terminate him); *Madden*, 549 F.3d at 677-78 (holding that the plaintiff had established a causal nexus where it was shown that a subordinate only provided one instance of misconduct by an African-American employee and withheld similar incidents by white employees); *Goodsite*, 573 F. App'x at 586-87 (plaintiff failed to show that the individual with discriminatory animus had any impact on the decision-making process other than providing a description of the events in question); *Mastellone*, 179 F. Supp. 3d at 26-7 ("[i]n cases where cat's paw liability has been found, the termination decision results from an investigation that was tainted by a discriminatory information flow") (internal citation omitted).

Duncan states that Mohrhaus had originally decided to give him "another coaching level," but, after consulting with Brummett, decided to terminate him. (Doc. No. 19 at PageID 368.) Prior to Duncan's termination, while Brummett was still his direct supervisor, Duncan alleges that Brummett would ask "[a]re you still able to run a club," "[d]o you feel like the business is getting away from you," and "[d]o you feel like the business is passing you by?" (Doc. No. 18-1 at PageID 155.) These comments were made in the years immediately preceding his termination. (*Id*.) Indeed, Duncan alleges that in 2004, Brummett had made it clear to him that she wanted to get rid

of some of the older assistant managers because "they weren't adapting." (*Id*. at PageID 113-14.)

The evidence demonstrates that Brummett was involved in the investigation of Duncan's handling of the racial incident. Both Mohrhaus and Brummett's statements regarding the April 23, 2019 meeting with Duncan show that Brummett questioned Duncan about the similarities between the February 2019 incident and the racial incident. (Doc. Nos. 18-25; 18-26.) Moreover, Mohrhaus and Brummett discussed her February 2019 conversation with Duncan regarding his need to conduct more thorough investigations, in the context of whether Duncan should be terminated for the racial incident. (Doc. No. 18-14 at PageID 308.) However, the decision to terminate Duncan was made by Mohrhaus with support from Santos and Human Resources. (Doc. Nos. 18-14 at PageID 308; 18-21 at PageID 327, 330; Doc. No. 19-5 at PageID 614).

Duncan's assertion that Brummett was the reason for his termination is speculative and unsubstantiated. Indeed, there is no evidence that Brummett's animus affected the decision to terminate Duncan. The only information Brummett passed along related to the February 2019 incident and her directions to Duncan that he needed to conduct more thorough investigations. (Doc. No. 18-14 at PageID 308.) There is no indication that this information was discriminatory or was passed along with discriminatory intent. *See Madden*, 549 F.3d at 677-78.

Moreover, the record indicates that Brummett was not aware of the decision to terminate Duncan until she was asked to serve as a witness at his termination meeting. (Doc. No. 18-14 at PageID 308). Mohrhaus' termination request included a slew of reasons for Duncan's termination, such as, "[n]o ownership of a critical situation, [n]o communication, [n]o follow-up, [n]o research, [n]o sense of urgency." (Doc. No. 18-27.) The information regarding the February 2019 incident was provided as background, not as its own reason for termination. (*Id*.) Thus, there is no evidence that Brummett's discussion with Mohrhaus was the cause of the ultimate decision to terminate

Duncan or that Brummett worked closely with Mohrhaus in coming to that decision. In short, Duncan has not established a causal nexus between Brummett's animus and his termination.[4]

Therefore, Duncan has failed to establish that the non-discriminatory reasons identified by Sam's Club did not actually motivate his termination.

### ii. Insufficient to Warrant the Challenged Conduct

Duncan argues that he appropriately delegated his managerial responsibilities to Naas while he was on vacation and, consequently, the racial incident alone is insufficient to justify his termination. (Doc. No. 19 at PageID 373.) He also argues that Sam's Club cannot rely on prior incidents or coachings because he was either not disciplined for those incidents or the coachings were fraudulent. (*Id*. at PageID 376-78.)

The evidence demonstrates that Duncan was informed of the racial incident, directed Naas to contact the wrong human resources employee, and then left on vacation. (Doc. Nos. 18-1 at PageiD 137-38, 186; 18-12 at PageID 286; 18-16 at PageID 319; 19-2 at PageID 402.) Moreover, Duncan left behind his work phone and computer, which appear to have been his only way of accessing his Sam's Club email. (Doc. No. 18-1 at PageID 138.) Had Duncan had access to his Sam's Club email, he would have been able to view the April 5 ethics ticket that was eventually sent to Mohrhaus and directed Duncan to review and handle the matter. (Doc. No. 18-19.) Additionally, Duncan never took the time to view the Facebook post describing the incident or review the reactions the post garnered. (*Id*.) The record further supports that Duncan could turn day-to-day operations of the Club over to Naas, but more significant issues facing the Club would

---

[4] Sam's Club's Reply repeatedly refers to Chuck Miller ("Miller"), Duncan's former marketing manager, and argues why he could not have formed the basis of a cat's paw theory of pretext as well. (Doc. No. 19 at 692-94.) Duncan appears to blame Miller for issuing the allegedly fraudulent yellow level coaching (Doc. No. 19 at PageID 377), but there is nothing to indicate that Duncan is alleging Miller is the but-for cause of his termination. Regardless, no evidence has been presented that Miller had any role in Duncan's termination for the racial incident. Therefore, the Court will not consider such an argument further.

16

remain his responsibility. (Doc. No. 18-21 at PageID 335.) By Duncan's own admission, he thought this issue might be sensitive due to "today's climate." (Doc. No. 18-1 at PageID 139.) Such an absolute abdication of responsibility and the failure to ensure his access to information alone would entitle Sam's Club to terminate a manager.

Moreover, even if Duncan's conduct was not sufficient to justify termination for just this singular incident, Duncan was already on an orange level coach, the second highest level. (Doc. Nos. 18-4 at PageID 236; 18-27.) Duncan's argues that these coachings were fraudulent. (Doc. No. 19 at PageID 377.) However, the record demonstrates that he had the ability to challenge his orange level coaching, but elected not to do so. (Doc. No. 18-1 at PageID 126.) Duncan cannot now argue that the coachings were fraudulent when he did not challenge the coachings at the time the issue first came to his attention.

Therefore, Duncan has failed to establish that the non-discriminatory reasons identified by Sam's Club for his termination was pretextual. The Court dismisses Duncan's first and second claims for age discrimination under the ADEA and Ohio law.

### d. **Duncan's Retaliation Claims**

Duncan's Complaint also contained claims for retaliation under the ADEA and Ohio law. Sam's Club made additional arguments regarding Duncan's retaliation claims in its Motion. (Doc. No. 18.) However, Duncan abandoned his retaliation claims, stating: "[i]n light of this Court's applicable page limitation, and in order to focus on Plaintiff's age discrimination claim, Plaintiff does not oppose herein Defendant's Motion as directed to his retaliation claim." (Doc. No. 19 at PageID 368, n. 3.) This assertion is disingenuous. The Court did deny Sam's Club leave to file a brief in excess of 20 pages. However, Duncan never sought leave to file excess pages and never informed the Court of his alleged predicament. Regardless, the Court finds that Duncan has elected

to abandon his claims of retaliation. Therefore, the Court dismisses Duncan's third and fourth claims for retaliation under the ADEA and Ohio law.

### IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. No. 18). This case shall be **TERMINATED** on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, February 9, 2022.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE
